# United States District Court
## Southern District of West Virginia (Charleston)
### CIVIL DOCKET FOR CASE #: 2:18-cv-01390

Riling et al v. Purdue Pharma L.P. et al
Assigned to: Judge David A. Faber
Referred to: Magistrate Judge Omar J. Aboulhosn
Cause: 28:1332 Diversity-Product Liability

Date Filed: 10/29/2018
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Andrew G. Riling**
*and*

represented by **Alexander D. McLaughlin**
THE CALWELL PRACTICE
P. O. Box 113
Charleston, WV 25321-0113
304/343-4323
Fax: 304/344-3684
Email: amclaughlin@calwelllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin D. Adams**
THE CALWELL PRACTICE
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
304/343-4323
Fax: 304/344-3684
Email: badams@calwelllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**L. Dante DiTrapano**
THE CALWELL PRACTICE
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
304-343-4323
Fax: 304-344-3684
Email: dditrapano@calwelllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**P. Rodney Jackson**
LAW OFFICE OF P. RODNEY JACKSON
106 Capitol Street
Charleston, WV 25301
304/345-7330
Email: prodjackson27@yahoo.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Booth Goodwin , II**
GOODWIN & GOODWIN
P. O. Box 2107
Charleston, WV 25328-2107
304/346-7000
Fax: 304/344-9692
Email: rbg@goodwingoodwin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy P. Lupardus**
LUPARDUS LAW OFFICE
P. O. Box 1680
Pineville, WV 24874-1680
304/732-0250
Fax: 304/732-0252
Email: tim@luparduslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W. Stuart Calwell**
THE CALWELL PRACTICE
P. O. Box 113
Charleston, WV 25321-0113
304/343-4323
Fax: 304/344-3684
Email: scalwell@calwelllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Beverly Riling**<br>*as next friends of* | represented by | **Alexander D. McLaughlin**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Benjamin D. Adams**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **L. Dante DiTrapano**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **P. Rodney Jackson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**R. Booth Goodwin , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy P. Lupardus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W. Stuart Calwell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**A. P. Riling**            represented by   **Alexander D. McLaughlin**
*a minor child under the age of 18*            (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin D. Adams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**L. Dante DiTrapano**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**P. Rodney Jackson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Booth Goodwin , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy P. Lupardus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W. Stuart Calwell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Purdue Pharma L.P.**

**Defendant**

**Purdue Pharma, Inc.**

**Defendant**

**The Purdue Frederick Company, Inc.**

**Defendant**

**McKesson Corporation**

**Defendant**

**Cardinal Health, Inc.**

**Defendant**

**AmerisourceBergen Corporation**

**Defendant**

**Endo Health Solutions Inc.**

**Defendant**

**Endo Pharmaceuticals, Inc.**

**Defendant**

**Mallinckrodt PLC**
*and*

**Defendant**

**Mallinckrodt Enterprises LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/29/2018 | 1 | COMPLAINT. Filing Fee $400.00. Receipt # AWVSDC-6903737. (Attachment: # 1 Civil Cover Sheet) (taq) (Entered: 10/31/2018) |
| 10/29/2018 | 2 | SUMMONS SUBMITTED by Andrew G. Riling, Beverly Riling, A. P. Riling, for AmerisourceBergen Corporation, Cardinal Health, Inc., Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., Mallinckrodt Enterprises LLC, Mallinckrodt PLC, McKesson Corporation, Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., re: 1 Complaint. (Attachments: # 1 Summons submitted as to Purdue Pharma, Inc., # 2 Summons submitted as to The Purdue Frederick Company, Inc., # 3 Summons submitted as to McKesson Corporation, # 4 Summons submitted as to Cardinal Health, Inc., # 5 Summons submitted as to AmerisourceBergen Corporation, # 6 Summons submitted as to Endo Health Solutions Inc., # 7 Summons submitted as to Endo Pharmaceuticals, Inc., # 8 Summons as to Mallinckrodt PLC, # 9 Summons as to Mallinckrodt Enterprises LLC) (taq) (Entered: 10/31/2018) |
| 10/29/2018 | | CASE assigned to Judge David A. Faber. (klc) (Entered: 11/01/2018) |
| 10/31/2018 | 3 | STANDING ORDER IN RE: ASSIGNMENT AND REFERRAL OF CIVIL ACTIONS AND MATTERS TO MAGISTRATE JUDGES ENTERED JANUARY 4, 2016. Discovery referred to Magistrate Judge Aboulhosn. (cc: attys; any unrepresented party) (taq) (Modified on 11/2/2018 to refer case to Judge Aboulhosn)(ts). |

| 10/31/2018 | 4 | ELECTRONIC SUMMONS ISSUED as to AmerisourceBergen Corporation, Cardinal Health, Inc., Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., Mallinckrodt Enterprises LLC, Mallinckrodt PLC, McKesson Corporation, Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., re: 1 Complaint. Summons returnable 21 days. Instructions to Counsel: This is your electronic summons. Please print as many copies of the Summons and Complaint as are necessary to effectuate service under Fed. R. Civ. P. 4. See Proof of Service page of this Summons form for filing a return of service if required by Fed. R. Civ. P. 4(l). (Attachments: # 1 Summons issued as to Purdue Pharma, Inc., # 2 Summons issued as to The Purdue Frederick Company, Inc., # 3 Summons issued as to McKesson Corporation, # 4 Summons issued as to Cardinal Health, Inc., # 5 Summons issued as to AmerisourceBergen Corporation, # 6 Summons issued as to Endo Health Solutions Inc., # 7 Summons issued as to Endo Pharmaceuticals, Inc., # 8 Summons issued as to Mallinckrodt PLC, # 9 Summons issued as to Mallinckrodt Enterprises LLC) (taq) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 11/14/2018 10:51:37 | | |
| **PACER Login:** | bdadams1750 | **Client Code:** | A.P. Riling |
| **Description:** | Docket Report | **Search Criteria:** | 2:18-cv-01390 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**ANDREW G. RILING AND BEVERLY RILING,**
**AS NEXT FRIENDS OF A.P. RILING, A MINOR**
**CHILD UNDER THE AGE OF 18,**

      **Plaintiffs,**

**v.**

      **CASE NO.** _2:18-cv-01390_

      **JURY TRIAL DEMANDED**

**PURDUE PHARMA L.P.;**
**PURDUE PHARMA, INC.;**
**THE PURDUE FREDERICK COMPANY, INC.;**
**MCKESSON CORPORATION;**
**CARDINAL HEALTH, INC.;**
**AMERISOURCEBERGEN CORPORATION;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**MALLINCKRODT PLC; and**
**MALLINCKRODT ENTERPRISES LLC,**

      **Defendants.**

### COMPLAINT

    Andrew G. Riling and Beverly Riling, individually and as the next friend of A.P. Page

Riling, hereby file their Complaint against the Defendants for damages, equitable, statutory, and

injunctive relief. In support thereof, Plaintiffs state as follows:

### INTRODUCTION

    1.    Like thousands of children born every year, A.P. Riling was born addicted to

opioids. Prenatal exposure to opioids causes severe withdrawal symptoms and lasting

developmental impacts. A.P. Riling was born eleven years ago, on February 25, 2007. The first

days of A.P. Riling's life were spent in excruciating pain as doctors weaned her from opioid

addiction. A.P. Riling will require years of treatment and counseling to deal with the effects of prenatal exposure to opoid medications. A.P. Riling is a victim of the opioid crisis that has ravaged Wyoming County, West Virginia, the epicenter of the national opioid crisis, causing immense suffering to those infants born addicted to opioids and great expense to those forced to deal with the aftermath.

2.      At birth, A.P. Riling was diagnosed as suffering from withdrawal symptoms associated with her birth mother's use of "strong prescription medication like oxycodone." A urine screen given to newborn A.P. confirmed the presence of oxycodone. A.P. was administered Phenobarbital, a potent sedative, four times a day for the first weeks of her life to control her withdrawal symptoms. While her condition was referred to as "withdrawal symptoms" in her 2007 medical record, A.P. suffered from a condition that is now commonly known as Neonatal Abstinence Syndrome ("NAS"). NAS is a condition suffered by babies of mothers addicted to opioids. A.P. Riling was forced to endure a painful start to her life. She spent the first several days of life crying excessively, arching her back, refusing to feed, and shaking. NAS is a clinical diagnosis, and "a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used or abused by the mother during pregnancy."[1]

3.      A.P. Riling was the natural child of her birth parents, Amanda Riling and Drew Riling. Drew was the son of Plaintiffs Beverly Riling and Andrew G. Riling. Prior to A.P.'s conception, Amanda and Drew Riling were living with Beverly and Andrew Riling. In June of 2006—most likely shortly after A.P.'s conception, although she did not have prenatal care so prenatal records cannot confirm her gestational age—Amanda Riling left Beverly and Andrew Riling's home, leaving her husband Drew, and also leaving her two boys, A.P.'s older brothers,

---

[1] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome,* 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

in the care of her husband and his parents.

4.    Upon information and belief, after leaving the home of Beverly and Andrew Riling, Amanda Riling, who was pregnant with A.P. when she left but not visibly so, returned to abusing prescription drugs, including drugs manufactured and distributed by the named defendants.

5.    Upon information and belief, during her pregnancy in 2006 and 2007, A.P. Riling's mother consumed opioids manufactured or distributed by the named defendants including:

  a.  Purdue's products, including Oxycontin, which is sold as extended release oxycodone tablets;

  b.  Endo's products, including Percocet, which is sold as oxycodone tablets mixed with acetaminophen;

  c.  Mallinckrodt's products, including Roxicodone, which is sold as immediate release oxycodone tablets, and generic pills for OxyContin, Roxicodone, and Percocet.

6.    It is likely that during discovery one or more additional manufacturers of opioid pills consumed by A.P.'s birth mother during her pregnancy will be identified, such as additional generic manufacturers of the name brand pills OxyContin, Roxicodone, and Percocet.

7.    Upon information and belief, during her pregnancy, A.P.'s birth mother, Amanda Riling, obtained oxycodone pills both "legally" through prescriptions written for her, and illegally, through the diversion of pills from suspicious prescriptions written for Amanda's parents, Maria Claudette Hall and Harold Hall.

8.    Upon information and belief, Amanda Riling's oxycodone prescriptions were

written by Manuel Barit, M.D., who practiced in or around Mullens, West Virginia, and by

Michael Kostenko, M.D., who practiced in or around Beckley, West Virginia.

9.    Upon information and belief, Maria Claudette Hall's and Harold Hall's

oxycodone prescriptions were written by Iraj Derakhshan, M.D., who practiced in and around

Beckley, West Virginia.

10.    Upon information and belief, Amanda Riling, Maria Claudette Hall, and Harold

Hall filled their oxycodone prescriptions primarily at the following pharmacies:  Country Roads

Mart Pharmacy, Glen Daniel, West Virginia; Charlie's Pharmacy, Pineville, West Virginia; Rite

Aid Pharmacy, Oceana, West Virginia; and Westside Pharmacy, Oceana, West Virginia.

11.    Upon information and belief, A.P.'s birth mother also obtained some oxycodone

pills illegally through criminal drug dealers, who capitalized on the criminal indifference of the

named Defendants with respect to the outrageously and suspiciously high volume of sales of

oxycodone pills to retail pharmacies, doctors, and clinics in southern West Virginia and in

Florida.

12.    A.P. Riling's experience is part of an opioid epidemic sweeping through the

United States, including Wyoming County, West Virginia, that has caused thousands of infants

great suffering and continuing developmental issues.  This epidemic is the largest health care

crisis in U.S. history. Plaintiffs bring this case for injuries suffered by A.P. Riling.

13.    The incidence of NAS has been increasing in the United States. The Substance

Abuse Mental Health Services Administration reported that 1.1% of pregnant women abused

opioids (0.9% used opioid pain relievers and 0.2% used heroin) in 2011.[2]

14.    In recent years, there has been a dramatic rise in the proportion of infants who

have been exposed to opioids.  Opioid use among women who gave birth increased in the United

_____

[2] *Id.*

4

States from 1.19 to 5.63 per 1,000 hospital births per year between 2000 and 2009.  Concurrently

the incidence of neonatal abstinence syndrome (NAS) among newborns during the same period

(from 1.20 per 1,000 hospital births per year in 2000 to 3.39 per 1,000 hospital births per year in

2009).[3]

      15.     The incidence of NAS in newborns born to opioid-dependent women is between

70 and 95 percent. Research suggests that newborns with NAS (most commonly associated of

opioid misuse during pregnancy) are more likely than all other hospital births to have low

birthweight or respiratory complications.

      16.     The NAS epidemic and its consequences could have been, and should have been,

prevented by the Defendants who control the U.S. drug distribution industry and the Defendants

who manufacture the prescription opioids.  These Defendants have profited greatly by allowing

southern West Virginia, including Wyoming County, West Virginia, to become flooded with

prescription opioids.

      17.     The drug distribution industry is supposed to serve as a "check" in the drug

delivery system, by securing and monitoring opioids at every step of the stream of commerce,

protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by

downstream pharmacies, doctors, clinics, or patients. Defendants woefully failed in this duty,

instead consciously ignoring known or knowable problems and data in their supply chains.

      18.     Defendants thus intentionally and negligently created conditions in which vast

amounts of opioids have flowed freely from drug manufacturers to innocent patients who

became addicted, to opioid abusers, and even to illicit drug dealers—with distributors regularly

fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to

[3] Patrick, S. W., Schumacher, R. E., Benneyworth, B. D., Krans, E. E., McAllister, J. M., & Davis, M. M. (2012). Neonatal abstinence syndrome and associated health care expenditures: United States, 2000–2009. *Journal of the American Medical Association, 307*(18), 1934–1940.

ignore "red flags" at the point of sale and before dispensing the pills.

19. Defendants' wrongful conduct has allowed billions of opioid pills to be diverted from legitimate channels of distribution into the illicit black market in quantities that have fueled the opioid epidemic in Wyoming County, West Virginia, and across the State of West Virginia. This is characterized as "opioid diversion." Acting against their common law and statutory duties, Defendants have created an environment in which opioid diversion is rampant. As a result, unknowing patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

20. For years, Defendants and their agents have possessed the ability to substantially reduce the consequences of opioid diversion, including the dramatic increase in the number of infants born with NAS. All the Defendants in this action share responsibility for perpetuating the epidemic and the exponential increase in the number of infants afflicted with NAS.

21. Defendants have foreseeably caused damages to A.P. Riling including the costs of neo-natal medical care, additional therapeutic, prescription drug purchases and other treatments for NAS afflicted newborns, and counseling and rehabilitation services after birth and into the future for persistent challenges with attention, mood, and cognition. Plaintiffs bring this civil action for compensatory damages, statutory damages, and any other relief allowed by law against the Defendant opioid drug distributors, retailers, and manufacturers that, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably injured, and continues to injure, Plaintiff A.P. Riling.

## PARTIES

### A. Plaintiff

22. A.P. Riling is an individual who has suffered Neonatal Abstinence Syndrome as a

result of exposure to oxycodone in utero. This drug exposure provides A.P. Riling the right to sue, through her next friend and guardian, for damages under product liability, negligence, and gross negligence.

23.     Andrew G. Riling and Beverly Riling are the guardians and next friends of A.P. Riling.

**B.      Defendants**

24.     McKesson Corporation ("McKesson") has its principal place of business in San Francisco, California and is incorporated under the laws of Delaware. During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers in the State of West Virginia.

25.     Cardinal Health, Inc. ("Cardinal") has its principal place of business in Ohio and is incorporated under the laws of Ohio. During all relevant times, Cardinal has distributed substantial amounts of prescription opioids to providers and retailers in the State of West Virginia.

26.     AmerisourceBergen Corporation has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers in the State of West Virginia.

27.     McKesson, Cardinal, and AmerisourceBergen are collectively referred to hereinafter as "Distributor Defendants."

28.     Purdue Pharma L.P. is a limited partnership organized under the laws of Delaware. Purdue Pharma, Inc. is a New York corporation with its principal place of business in Stamford, Connecticut, and The Purdue Frederick Company is a Delaware corporation with its

principal place of business in Stamford, Connecticut (collectively, "Purdue"). Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the U.S. and West Virginia. OxyContin is Purdue's best-selling opioid. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

29.    Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a wholly- owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "Endo.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and West Virginia. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and West Virginia, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

30.    Mallinckrodt plc is a public limited liability company chartered in the Republic of Ireland. Mallinckrodt plc identifies its principal place of business as being in Staines-upon-Thames, United Kingdom, on public filings. However, upon information and belief, the actual headquarters of Mallinckrodt plc is in the vicinity of St. Louis, Missouri, United States. For example, Mallinckrodt plc's President and CEO, Mark Trudeau, lists his location on his LinkedIn page as "Greater St. Louis Area," and the other activities listed on his LinkedIn page firmly establish Trudeau as a resident of St. Louis, Missouri, not Dublin, Ireland, and not

Staines-upon-Thames, United Kingdom. At a conference call in 2015, Mallinckrodt's Chief Financial Officer, Mark Harbaugh, led into a baseball metaphor by noting, "I'm in St. Louis so this is a baseball town." Mallinckrodt Enterprises LLC is Delaware limited liability company with its principal place of business in Hazelwood, Missouri, United States, and the successor to Mallinckrodt LLC, which was also a Delaware limited liability company headquartered in Hazelwood, Missouri. Mallinckrodt Enterprises LLC (fka Mallinckrodt LLC) is and has been, at all relevant times, licensed to do business in West Virginia. Collectively, Mallinckrodt plc and Mallinckrodt Enterprises LLC are referred to as "Mallinckrodt." Mallinckrodt's core business revolves around the manufacture, marketing, and sale of controlled substances in the United States market, and its special expertise is in navigating United States controlled substance laws and regulations, as well as the regulatory agencies that implement them. Mallinckrodt's opioid portfolio includes both brand name drugs—including the current rights to Roxicodone, the name brand for immediate release oxycodone tablets sold in pills containing up to 30 mg of oxycodone—and an extensive portfolio of current and former generic opioids, which fall under what Mallinckrodt euphemistically refers to as its "Specialty Generics" business. Included within Mallinckrodt's generic opioids portfolio are generics of Roxicodone itself—immediate release oxycodone tablets sold in pills containing as much as 30 mg of oxycodone per pill, which, along with pre-abuse deterrent OxyContin formulations in 40 mg and 80 mg tablets, was and remains the opioid prescription and pill of choice for drug abusers and drug diverters throughout the United States. Mallinckrodt was purchased by Tyco International plc (nka Johnson Controls International plc) in 2000, spun off from Tyco into Covidien plc in 2007, and then spun off from Covidien as Mallinckrodt plc in 2013. Upon information and belief, through its predecessor in interest, Tyco International, Mallinckrodt also manufactured, marketed, and

sold a generic extended release oxycodone tablet—a generic for OxyContin—during the time period in question (2006 and 2007). Upon information and belief, Defendant Mallinckrodt is the clear United States market leader in generic oxycodone tablets generally and of generic 30 mg immediate release oxycodone tablets specifically, and was the market leader in those categories in 2006 and 2007 as well.

31.     Purdue, Endo, and Mallinckrodt are collectively referred to hereinafter as the "Pharmaceutical Defendants."

## JURISDICTION AND VENUE

32.     Jurisdiction of this Court arises under the laws of the United States 28 U.S.C. § 1332(a), as the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of attorney's fees and costs.

33.     Defendants have engaged in conduct and activities over a long time, systematically, individually, jointly, and severally, in West Virginia that have caused all of the damages of Plaintiffs and A.P. Riling all of which form the bases of the causes of action in this Complaint as against Defendants. Defendants have committed multiple torts and breaches within the State of West Virginia, repeatedly and systematically.

34.     Defendants, for a long time, repeatedly and systematically, have substantial contacts and business relationships within West Virginia and its patients and citizens, including consensual relationships and contracts performed within West Virginia, some or all of which form the basis of the causes of action in this Complaint as against Defendants.

35.     This Court has personal jurisdiction over Defendants, each of which has committed torts, in part or in whole, within the State of West Virginia, as alleged herein. Moreover, Defendants have substantial contacts and business dealings directly within West

Virginia by virtue of their distribution, dispensing, and sales of prescription opioids. All causes of action herein relate to Defendants' wrongful actions, conduct, and omissions committed against Plaintiffs and the consequences and damages related to said wrongful actions, conduct, and omissions.

36.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claims occurred in the Southern District of West Virginia.

<u>**BACKGROUND FACTS**</u>

37.     Opioid means "opium – like" and the term includes all drugs derived in whole or in part from the opium poppy.

38.     The United States Food and Drug Administration's website describes this class of drugs as follows: "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly. But when misused or abused, they can cause serious harm, including addiction, overdose, and death."

39.     Prescription opioids with the highest potential for addiction are categorized under Schedule II of the Controlled Substances Act. They include non-synthetic derivatives of the opium poppy (such as codeine and morphine, which are also called "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), or fully synthetic derivatives (such as fentanyl and methadone).

40.     Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain, pain

relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

## PHARMACEUTICAL DEFENDANTS' WRONGFUL CONDUCT WITH RESPECT TO THE MISBRANDING OF BRAND-NAME OPIOIDS AND THE FALSE AND UNLAWFUL MARKETING OF BRAND-NAME AND GENERIC OPIOIDS

41. To establish and exploit the lucrative market of chronic pain patients, each Pharmaceutical Defendant developed a well-funded, sophisticated, and negligent marketing and/or distribution scheme with respect to their products. These schemes targeted consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties to spread misrepresentations about the risks and benefits of long-term opioid use—statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other Defendants and opioid manufacturers. These statements were unsupported by and contrary to the scientific evidence. These statements were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence. They also targeted susceptible prescribers and vulnerable patient populations, including those in West Virginia.

42. The Pharmaceutical Defendants spread their false and negligent statements by marketing their branded opioids directly to doctors and patients in West Virginia. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and negligent statements about the risks and benefits of opioids for the treatment of

chronic pain throughout geographic areas and patient demographics of West Virginia.

43.     The Pharmaceutical Defendants' direct and branded ads negligently portrayed the benefits of opioids for chronic pain. For example, Purdue ran a series of ads, called "Pain Vignettes," for OxyContin that featured chronic pain patients and recommended OxyContin for each.

44.     The Pharmaceutical Defendants also promoted the use of opioids for chronic pain through "detailers" – sophisticated and specially trained sales representatives who visited individual doctors and medical staff, and fomented small-group speaker programs.

45.     The Pharmaceutical Defendants invited doctors to participate, for payment and other remuneration, on and in speakers' bureaus and programs paid for by these Defendants. These speaker programs were designed to provide incentives for doctors to prescribe opioids, including recognition and compensation for being selected as speakers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by these Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

46.     The Pharmaceutical Defendants' detailing to doctors was highly effective in the national proliferation of prescription opioids. Defendants used sophisticated data mining and intelligence to track and understand the rates of initial prescribing and renewal by individual doctors, allowing specific and individual targeting, customizing, and monitoring of their marketing.

47.     The Pharmaceutical Defendants have had unified marketing plans and strategies from state to state, including West Virginia. This unified approach ensures that Defendants'

messages were and are consistent and effective across all their marketing efforts.

48.     The Pharmaceutical Defendants negligently marketed opioids in West Virginia through unbranded advertising that promoted opioid use generally, but were silent as to a specific opioid. This advertising was ostensibly created and disseminated by independent third parties, but funded, directed, coordinated, edited, and distributed, in part or whole, by these Defendants and their public relations firms and agents.

49.     The Pharmaceutical Defendants used putative third-party, unbranded advertising to avoid regulatory scrutiny as such advertising is not submitted to or reviewed by the FDA. These Defendants used third-party, unbranded advertising to create the false appearance that the negligent messages came from an independent and objective source.

50.     The Pharmaceutical Defendants' negligent unbranded marketing also contradicted their branded materials reviewed by the FDA.

51.     The Pharmaceutical Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by these Defendants because their public positions supported the use of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." These Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to promote the opioid industry pipeline, from manufacture to distribution to retail.

52.     These Defendants entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the American Pain Foundation ("APF"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association

("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

53.     The first prominent example of this scheme originated in 1995, with Purdue, when, according to government documents, Purdue learned from OxyContin focus groups that physicians had concerns about the potential for addiction and abuse of opioids generally, and therefore the risks of OxyContin generally.  Purdue also learned from these focus groups that there was a large untapped demand for a drug that could effectively treat pain and chronic pain without the addictive properties commonly associated with opioids.  Purdue therefore set a course to market OxyContin as a drug with all of the pain-relieving benefits of the opioids but with much lower risk of addiction.

54.     Between 1996 and 2002, for example, Defendant Purdue funded more than 20,000 pain-related educational programs through direct sponsorship or financial grants, which studies have shown had enormous influence on the physicians' prescribing practices ("Purdue's Education Campaign").

55.     Upon information and belief, Purdue's Education Campaign spread false information intended to minimize the risk of addiction associated with opioids generally and OxyContin specifically—the risk of addiction that Purdue knew had been the primary reason that physicians were cautious about prescribing opioids and OxyContin specifically prior to Purdue's Education Campaign.

56.     Upon information and belief, the false information regarding addiction in Purdue's Education Campaign reached Drs. Barit, Kostenko, and Derakhshan either directly or indirectly, and had its intended effect of influencing their prescribing practices with respect to opioids, oxycodone, and OxyContin.

57.     Upon information and belief, Purdue's Education Campaign impacted prescribing physicians in different or multiple ways:  (1) some prescribers were persuaded that their prior perceptions about the risks of opioid addiction generally were exaggerated, and therefore they should in good conscience be treating more patients with complaints of pain with oxycodone prescriptions; (2) some prescribers were persuaded that the risks of opioid addiction were greatly reduced if not completely eliminated by OxyContin's extended release formulation, and therefore these concerns did not apply to OxyContin; and (3) Purdue's Education Campaign provided cover, and was always intended to provide cover, for unscrupulous prescribers to increase the revenue and profitability of their practices by prescribing opioids to patients who sought them, without due regard for the risks of addiction or diversion.  Upon information and belief, Purdue was completely indifferent as to how or why prescribers were motivated to write more prescriptions for OxyContin pills so long as they wrote more prescriptions for OxyContin.

58.     Upon information and belief, Drs. Barit, Kostenko, and Derakhshan were influenced by Purdue's Education Campaign and relied upon it in or more of the ways described in the preceding paragraph, and consequently started prescribing more oxycodone pills as a result of Purdue's Education Campaign.

59.     Upon information and belief, whatever their intentions may have been when they initially started prescribing more oxycodone pills in response to Purdue's Education Campaign, by 2006 and 2007—when Amanda Riling was pregnant with A.P. Riling—Drs. Barit, Kostenko, and Derakhshan (and countless other physicians like them) were writing prescriptions for oxycodone pills without careful regard for evidence of drug addiction and drug diversion in their patients.

60.     The Pharmaceutical Defendants collaborated to spread negligent messages about

16

the risks and benefits of long-term opioid therapy.

61.     To convince doctors and patients in West Virginia that opioids can and should be used to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by conveying negligent misrepresentations to those doctors and patients about the risks and benefits of long-term opioid use, these Defendants made claims that were not supported by or were contrary to the scientific evidence and which were contradicted by data.

62.     To convince doctors and patients that opioids are safe, the Pharmaceutical Defendants negligently trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations—which are described below—reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

63.     As an example, according to government documents, beginning in 1996 and continuing until 2007, Purdue falsely marketed OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause withdrawal than other opioid pain medications. This marketing effort (hereafter, "Purdue Marketing Blitz") focused on several mediums and a few key messages.

64.     As part of the Purdue Marketing Blitz, Purdue trained sales representatives to tell physicians that it was difficult to reduce OxyContin tablets to a form that could be taken intravenously as a drug of abuse.  Purdue knew that this was not true, and that the oxycodone in OxyContin could readily be extracted.

65.     Also as part of the Purdue Marketing Blitz, Purdue trained its sales staff to tell physicians that OxyContin's extended release formulation resulted in a markedly lower risk of addiction than immediate release opioids, without adequate data to support this claim or even knowing it to be untrue.  Purdue trained its sales staff to tell physicians that OxyContin's extended release formulation would result in a relatively steady level of oxycodone in the blood stream, without the peaks and troughs that create euphoria and withdrawal associated with addiction.  Purdue knew that this was not true, that blood oxycodone levels would vary significantly over time in patients taking OxyContin, and that the time-course would vary from patient to patient.

66.     Also as part of the Purdue Marketing Blitz, Purdue trained its sales staff to tell physicians that the risk of addiction with opioids like OxyContin was "less than one percent," even though the only (scant) data it possessed were from opioid addiction in acute pain settings, not the long-term treatment of chronic pain that its sales staff was pushing on physicians, including primary care physicians, with this "less than one percent" message.

67.     Upon information and belief, Purdue's Marketing Blitz impacted prescribing physicians in different or multiple ways:  (1) Some prescribers were persuaded that the risks of opioid addiction were greatly reduced if not completely eliminated by OxyContin's extended release formulation, and therefore their concerns about opioid addiction and diversion did not apply to OxyContin and generic extended release oxycodone pills; (2) some prescribers were

persuaded that their prior perceptions about the risks of opioid addiction generally were exaggerated, and therefore they should in good conscience be treating more patients with complaints of chronic pain with oxycodone prescriptions such as OxyContin, Roxicodone, and generics for these; and (3) Purdue's Marketing Blitz provided cover, and was always intended to provide cover, for unscrupulous prescribers to increase the revenue and profitability of their practices by prescribing OxyContin (and oxycodone more generally), without due regard for the risks of addiction or diversion, including to those patients who sought opioids for purposes of abuse and diversion. Upon information and belief, Purdue was completely indifferent as to how or why prescribers were motivated to write more prescriptions for OxyContin pills so long as they wrote more prescriptions for OxyContin.

68. Upon information and belief, Drs. Barit, Kostenko, and Derakhshan were influenced by Purdue's Marketing Blitz and relied upon it in or more of the ways described in the preceding paragraph, and consequently started prescribing more oxycodone pills as a result of Purdue's Marketing Blitz.

69. Upon information and belief, whatever their intentions may have been when they initially started prescribing more OxyContin pills in response to Purdue's Marketing Blitz, by 2006 and 2007—when Amanda Riling was pregnant with A.P. Riling—Drs. Barit, Kostenko, and Derakhshan (and countless other physicians like them) were writing prescriptions for oxycodone pills without careful regard for evidence of drug addiction and drug diversion in their patients.

70. The Pharmaceutical Defendants negligently claimed that the risk of opioid addiction is low and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged

use of opioids.

71.     These claims are contrary to longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

72.     The FDA further exposed the falsity of the Pharmaceutical Defendants' claims about the low risk of addiction when it announced changes to the labels for certain opioids in 2013 and for other opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

73.     The Pharmaceutical Defendants negligently instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids.  Defendants called this phenomenon "pseudo-addiction" —a term coined by Dr. David Haddox in 1989, who then went to work for Purdue, and resurrected and utilized by Purdue in the 1990s and early 2000s in formulating a response to reports from prescribing

physicians of addictive behaviors in their patients. At all relevant times, the Pharmaceutical Defendants negligently claimed that pseudo-addiction was substantiated by scientific evidence.

74.     The 2016 CDC Guideline rejects the concept of pseudo-addiction, explaining that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer- term use," and that physicians should reassess "pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

75.     The Pharmaceutical Defendants negligently instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to addiction. These misrepresentations were reckless because Pharmaceutical Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Pharmaceutical Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids.

76.     The 2016 CDC Guideline exposes the falsity of these misrepresentations, noting that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." The Guideline emphasizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

77.     To underplay the risk and impact of addiction and make doctors feel more

comfortable starting patients on opioids, Pharmaceutical Defendants negligently claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

78.    Pharmaceutical Defendants negligently minimized the significant symptoms of opioid withdrawal—which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction—and grossly understated the difficulty of tapering, particularly after long-term opioid use. The 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

79.    The Pharmaceutical Defendants negligently claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences, and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat

chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief.

80.     These and other representations conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

81.     The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

82.     These numerous, longstanding misrepresentations minimizing the risks of long-term opioid use persuaded doctors and patients to discount or ignore the true risks. Pharmaceutical Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain."  In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally

beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, Defendants negligently and misleadingly touted the benefits of long-term opioid use and negligently and misleadingly suggested that these benefits were supported by scientific evidence.

83.     These claims find no support in the scientific literature. The 2016 CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely" (emphasis added). The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

84.     The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations."

85.     The 2016 CDC Guideline was not the first time a federal agency repudiated the Pharmaceutical Defendants' claim that opioids improved function and quality of life. In 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

86.     The Pharmaceutical Defendants also negligently and misleadingly emphasized or

exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." The 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

87.     In addition, Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose.  In fact, OxyContin does not last for 12 hours—a fact that Purdue has known at all relevant times. According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half.  This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and negligent, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.  It also encourages drug abuse, because such patients, motivated by withdrawal and absence of pain relief, are inclined to seek other sources of opioids or to take their prescribed medication at

shorter-than-prescribed time intervals.

88.     Nevertheless, Purdue negligently promoted OxyContin as if it were effective for a full 12 hours. Indeed, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

89.     As a part of their negligent marketing scheme, the Pharmaceutical Defendants identified and targeted susceptible prescribers and vulnerable patient populations in West Virginia. For example, these Defendants focused their negligent marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Defendants' misrepresentations.

90.     The Pharmaceutical Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and negligent. The history of opioids, as well as research and clinical experience over the 10 years of aggressive marketing of OxyContin and other opioids prior to Amanda Riling's pregnancy with A.P. , established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned these Defendants of this, and these Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers.

91.     Moreover, at all times relevant to this Complaint, the Pharmaceutical Defendants took steps to avoid detection of and to fraudulently conceal their negligent marketing and

unlawful, unfair, and fraudulent conduct. For example, the Pharmaceutical Defendants disguised their own role in the negligent marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and negligent statements about the risks and benefits of long-term opioid use for chronic pain.

92. The Pharmaceutical Defendants also tried to conceal their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public.

93. Finally, the Pharmaceutical Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' negligent messages was not apparent to medical professionals who relied upon them in making treatment decisions.

94. The Pharmaceutical Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

95. The Pharmaceutical Defendants' negligent marketing scheme caused and continues to cause doctors in West Virginia to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' negligent marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' negligent marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent these Defendants' negligent marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

96. Upon information and belief, the Pharmaceutical Defendants' misbranding and negligent and fraudulent marketing schemes with respect to opioids described in the preceding paragraphs impacted prescribing physicians in different or multiple ways: (1) some prescribers were persuaded that their prior perceptions about the risks of opioid addiction generally were exaggerated, and therefore they should in good conscience be treating more patients with complaints of pain with oxycodone prescriptions; (2) some prescribers were persuaded that the risks of opioid addiction were greatly reduced if not completely eliminated by extended release formulations of oxycodone, and therefore these concerns did not apply to OxyContin and other (including generic) extended release formulations; and (3) these misbranding and negligent and fraudulent marketing schemes provided cover, and were always intended by the Pharamceutical Defendants to provide cover, for unscrupulous prescribers to increase the revenue and profitability of their practices by prescribing opioids to patients who sought them, without due regard for the risks of addiction or diversion. Upon information and belief, the Pharamaceutical Defendants were completely indifferent as to how or why prescribers were motivated to write more prescriptions for their brand-name and generic oxycodone pills so long as they wrote more

prescriptions for them.

97.     Upon information and belief, Drs. Barit, Kostenko, and Derakhshan were influenced by the misbranding and negligent and fraudulent marketing schemes of the Pharmaceutical Defendants and relied upon them in or more of the ways described in the preceding paragraph, and consequently started prescribing more oxycodone pills as a result of the schemes.

98.     Upon information and belief, whatever their intentions may have been when they initially started prescribing more oxycodone pills in response to the misbranding and negligent and fraudulent marketing schemes of the Pharmaceutical Defendants, by 2006 and 2007—when Amanda Riling was pregnant with A.P. Riling—Drs. Barit, Kostenko, and Derakhshan (and countless other physicians like them) were writing prescriptions for oxycodone pills without careful regard for evidence of drug addiction and drug diversion in their patients.

99.     The escalating number of opioid prescriptions written by doctors who were deceived by the Pharmaceutical Defendants' negligent marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and especially southern West Virginia.

100.    As a result of the conduct of the Pharmaceutical Defendants described in the preceding paragraphs—their misbranding and negligent and fraudulent marketing schemes, including but not limited to Purdue's Education Campaign and Purdue's Marketing Blitz—A.P. Riling was born addicted to oxycodone, suffered at the start of life from the short-term effects of NAS, and continues to suffer from the persistent effects of prenatal exposure to oxycodone, including difficulties with attention, mood, and cognition.

**PHARMACEUTICAL DEFENDANTS' WRONGFUL CONDUCT WITH RESPECT TO THEIR FAILURE TO MAINTAIN EFFECTIVE CONTROLS AGAINST DIVERSION**

## AND FAILURE TO REPORT SUSPICIOUS ORDERS

101.    Federal and state law requires manufacturers of controlled substances, not just distributors, to maintain effective controls against diversion and to detect and report suspicious orders of controlled substances. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. Under the West Virginia common law, a manufacturer that fails to comply with an established duty of care—whatever its source—can be sued for its negligent and reckless misconduct in failing to comply with that duty of care.

102.    Pharmaceutical Defendants also have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

103.    At all relevant times, the Pharmaceutical Defendants—including manufacturers of both name-brand and generic oxycodone pills—used sophisticated tracking data and distributor financial incentive schemes to keep tabs on where their pills were going, not just at the distributor level but at the retail pharmacy level, and also to identify the major prescribers of opioids.

104.    At all relevant times—including in 2006 and 2007, when Amanda Riling was pregnant with A.P. , and in the years preceding, when the Pharmaceutical Defendants built and captured the markets for their oxycodone pills—these manufacturers used their data for the purpose of increasing the sales of their pills by focusing their marketing and distributor-incentive incentive efforts where those efforts were most likely to result in increased sales or the

competitive gain in lucrative markets.

105.     Put more simply, in 2006 and 2007 and the years before, the Pharmaceutical Manufacturers used their sales data *to capture and increase* their sales to "pill mills."  The pill mills are the physicians and pharmacies whose patently excessive opioid and oxycodone prescribing and dispensing practices were the primary source of diversion of oxycodone pills during the time period of Amanda Riling's pregnancy with A.P. , whether that diversion was occurring through family and friends, as with Amanda's parents supplying Amanda, or through arms-length black market transactions, as with Amanda's drug dealers.

106.     That they used their data to gain an advantage in sales and to increase sales to pill mills—both by outcompeting other manufacturers for these lucrative markets and by encouraging and creating financial incentives for pill mills to expand their activities—is even more reprehensible because they had a duty to use that data for the opposite purpose, and to report pill mills and suspected pill mills to federal authorities.  In other words, while they had systems in place to detect suspicious orders, rather than identifying them as such and reporting them as required, they focused marketing and incentive efforts on them in a way that enabled and fostered their activities.

107.     For years, Purdue has been tracking prescriber practices through a contract with a company called I.M.S.  Purdue used this and other prescriber data to compile prescriber profiles for physicians.  Purdue used these profiles in 1996 to 2007 to identify the physicians who prescribed opioids at relatively high rates, and then targeted their sales and marketing efforts, including individual sales calls from sale representatives, at those physicians, with the dual purpose of capturing a higher share of their prescriptions for OxyContin, and also of encouraging those physicians who were already prescribing large quantities of opioids to prescribe even

31

higher quantities of opioids. Purdue's practice not only deceived well-intentioned physicians into prescribing oxycodone to more patients and at increasing doses, but it also had a secondary and intended effect of arming physicians who wanted to increase the profitability of their practices by courting drug addicts and drug diverters with faulty arguments and flawed and out-of-context statistics and evidence in defense of their profit-seeking behavior. All of this fueled the diversion of oxycodone and OxyContin specifically. Far from reporting suspicious prescribers, Purdue encouraged them.

108. Upon information and belief, in 2006 and 2007, and probably for years before that, Drs. Barit, Kostenko, and Derakhshan were writing opioid, oxycodone, and specifically OxyContin prescriptions in quantities—both in terms of large quantities to individual patients, and a large volume and percentage of patients—that should have raised suspicions that they were fueling the abuse and diversion of opioids to a sophisticated manufacturer, like Purdue, with access to their prescribing data. Upon information and belief, Purdue negligently and recklessly declined to report the activities of these physicians, and recklessly encouraged those activities.

109. Upon information and belief, in 2006 and 2007, and probably for years before that, Purdue was aware, to some degree of confidence, of which clinics and physicians were writing and dispensing opioid, oxycodone, and specifically OxyContin prescriptions both in southern West Virginia and nationally in places like Florida in quantities—both in terms of large quantities to individual patients, and a large volume and percentage of patients—that should have raised suspicions that they were fueling the national diversion of oxycodone and OxyContin and supplying the pipeline of diverted oxycodone and OxyContin pills that served the illegal black markets nationally and specifically in southern West Virginia. Upon information and belief, Purdue negligently and recklessly declined to report those activities, and recklessly encouraged

those activities.

110.    In 2001, the United States Department of Justice, Drug Enforcement

Administration ("DEA") released a communication to the pharmaceutical industry called,

"Action Plan to Prevent the Diversion and Abuse of OxyContin" ("OxyContin Action Plan").

This OxyContin Action Plan, which specifically targeted OxyContin (and the few then-available

generics for OxyContin, i.e. extended release formulations of oxycodone) as a "drug of concern,"

became widely known among not just opioid manufacturers but also prescribers and pharmacies,

including "pill mill" prescribers and pharmacies—those prescribers and pharmacies that were

fueling the abuse and diversion of OxyContin and oxycodone generally.

111.    Data published by researchers at the United States Centers for Disease Control

("CDC") in 2012 show that the OxyContin Action Plan had some impact on prescriptions of

OxyContin itself.  According to the CDC researchers, the national number of prescriptions per

100 persons of extended release oxycodone tablets (i.e., OxyContin and OxyContin generics)

jumped by over 18% (1.94 to 2.30) from 2000 to 2001, but then actually *declined*—dropping to

2.16—from 2001 to 2002.  Overall, that number for extended release oxycodone (OxyContin)

remained relatively flat from 2001 until Amanda Riling's pregnancy in 2006, by which time the

number of prescriptions had crept back up to 2.33 per 100.

112.    However, the CDC data also shows that the OxyContin Action Plan had no

impact on the overall upward trend in prescriptions written for oxycodone.  Prescribers—upon

information and belief, especially pill mill prescribers and others anxious to avoid the attention

of the DEA— simply switched a portion of their patients to immediate release formulations of

oxycodone.  The name brand most commonly associated with immediate release oxycodone

tablets is Roxicodone, but immediate release oxycodone tablets were already widely available as

33

generics.

113.    Enter St. Louis based Defendant Mallinckrodt, which was then a division of Tyco International.  Mallinckrodt, upon information and belief, specializes in the manufacture and sale of controlled substances.  Mallinckrodt owns some significant brand-name controlled substances (including, now, Roxicodone, but not in 2006 and 2007), but really specializes in what it refers to as "Specialty Generics"—generics for controlled substances.  While this aspect of Mallinckrodt's business was less open to public view when it was only one (relatively smaller) part of Tyco's larger portfolio in 2006, since being spun off Mallinckrodt proudly announces to investors that it has special expertise in the manufacture and sale of controlled substances and that it views this business as an essential cash cow, where it enjoys market power and other competitive advantages.

114.    Upon information and belief, Mallinckrodt's true specialty is in using financial incentives—called "chargebacks"—to its distributors in order to obtain data from which it can quickly and efficiently identify rising pill mills and geographical clusters of controlled substance abuse and diversion so it can direct its efforts to capturing the lion's share of those lucrative markets.  In other words, Mallinckrodt specializes in beating other generic manufacturers of controlled substances to the large and profitable, less competitive (at least as far as generics go), but somewhat risky market for the drugs that end up being abused and diverted.

115.    While (as discussed in the previous section) Purdue built up a huge market for opioids in the first instance by falsely marketing OxyContin as less likely to result in the problems of addiction, abuse, and diversion than other opioids due to its extended release formulation, when OxyContin came into the crosshairs of the DEA in 2001—due to its by then undeniable problems with addiction, abuse, and diversion—a large number of OxyContin

prescribers were ready and willing to shift patients to immediate release oxycodone, whether because they had now earnestly come to the belief that the abuse and diversion problems associated with OxyContin related to the large number of milligrams of oxycodone per OxyContin tablet, or because they were pill mills anxious to keep their thriving practices going without attracting too much DEA attention.

116.    The CDC researcher data show that the number of prescriptions per 100 patients for immediate release formulations of oxycodone jumped by 56% in the time period from 2001 to 2006 (from 6.63 to 10.34), while prescriptions for extended release formulations were flat. Immediate release oxycodone prescriptions jumped another 11% from 2006 to 2007, which are the years when that span Amanda Riling's pregnancy with A.P. Riling.

117.    Upon information and belief the major manufacturer that profited from this transition from OxyContin to immediate release oxycodone was Mallinckrodt, which had considerable market power at the time in the generic immediate release oxycodone market. (Mallinckrodt and Cephalon (as Teva) also at the time both made and sold generic extended release oxycodone pills.)

118.    Upon information and belief, in 2006 and 2007, and most likely for years preceding that, Mallinckrodt used financial incentives, called chargebacks, to obtain data from distributors about the end use markets for generic oxycodone tablets, such as the pharmacies and geographical centers associated with oxycodone sales in large volumes (relative to population) and other factors that indicated they were likely to be associated with abuse and diversion, rather than legitimate medical use, and therefore most likely to continue to grow at high rates with the growing problem of addiction and abuse started by OxyContin.

119.    Mallinckrodt did not use the information available to it from its chargeback data

to fulfill its legal duty to contain diversion of its oxycodone pills and to report suspicious orders. Rather, upon information and belief, Mallinckrodt used its data to offer financial incentives and engage in other marketing and promotional efforts to capture and increase its market power over generic oxycodone tablets with the pharmacies and geographical centers associated with oxycodone sales in large volumes (relative to population) and other factors that indicated they were likely to be associated with abuse and diversion, rather than legitimate medical use, and therefore most likely to continue to grow at high rates with the continually growing problem of addiction and abuse started by OxyContin.

120.    Mallinckrodt negligently and recklessly declined to fulfill its duty to report orders of oxycodone tablets that it knew or should have known were suspicious for abuse and diversion. Instead, upon information and belief, Mallinckrodt encouraged— through financial incentives and other programs aimed at controlling those markets—the ever increasing purchase of its generic oxycodone pills by the very retail customers that it should have been reporting as suspicious for diversion activities.

121.    Upon information and belief, in 2006 and 2007, and probably for years before that Mallinckrodt was aware of pharmacies in southern West Virginia and pharmacies and clinics in Florida (which by this time were fueling the national epidemic) that were placing suspicious orders of its products.  Upon information and belief, Mallinckrodt negligently and recklessly declined to report or control the activities of these pharmacies and clinics, and recklessly encouraged those activities.

122.    Whether or not Mallinckrodt possessed sufficiently granular data to track these suspicious orders to Drs. Barit, Kostenko, and Derakhshan, upon information and belief, in 2006 and 2007, and probably for years before that, Mallinckrodt was aware of suspicious orders being

placed by Country Roads Mart Pharmacy, in Glen Daniel, West Virginia; by Charlie's Pharmacy, in Pineville, West Virginia; by Rite Aid Pharmacy, in Oceana, West Virginia; and by Westside Pharmacy, in Oceana, West Virginia.  Upon information and belief, these suspicious orders included orders for a disproportionate amount of oxycodone and other opioids, and orders from these pharmacies for oxycodone and other opioids from multiple distributors. Mallinckrodt declined to report or otherwise control these suspicious orders.

123.    As a result of the negligent and reckless conduct of the Pharmaceutical Defendants described in the preceding paragraphs in facilitating and encouraging diversion of their products rather than maintaining effective controls against diversion, A.P. Riling was born addicted to oxycodone, suffered at the start of life from the short-term effects of NAS, and continues to suffer from the persistent effects of prenatal exposure to oxycodone, including difficulties with attention, mood, and cognition.

## DISTRIBUTOR DEFENDANTS' WRONGFUL CONDUCT

124.    The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85-90 % of all revenues from drug distribution in the United States, an estimated $378.4 billion in 2015. The distributors then supply opioids to pharmacies, doctors, and other healthcare providers, which then dispense the drugs to patients.

125.    Manufacturer Defendants and Distributor Defendants share the responsibility for controlling the availability of prescription opioids.  Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use.  Diversion can

occur at any point in the opioid supply chain.

126.    For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

127.    Diversion occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

128.    Opioid diversion occurs in the United States at an alarming rate.  In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

129.    Every year, thousands of people in West Virginia misuse and abuse opioid pain relievers that can lead to addiction, neonatal abstinence syndrome, overdose and death.

130.    Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States.

131.    A.P. Riling has been significantly damaged by the effects of the Distributor Defendants' opioid diversion.

132.    Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise

38

reasonable care to prevent the threatened harm.

133.    In addition to having common law duties, the Distributor Defendants are governed by the statutory requirements of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq*. and its implementing regulations. These requirements were enacted to protect society from the harms of drug diversion.  The Distributor Defendants' violations of these requirements show that they failed to meet the relevant standard of conduct that society expects from them. The Distributor Defendants' repeated, unabashed, and prolific violations of these requirements show that they have acted in total reckless disregard.

134.    By violating the CSA, the Distributor Defendants are also liable under the law of West Virginia as herein alleged.

135.    The CSA creates a legal framework for the distribution and dispensing of controlled substances. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market."  H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

136.    Accordingly, the CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity that manufactures, distributes, or dispenses opioids must obtain a "registration" with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA, otherwise controlled substances move from the legal to the illicit marketplace, and there is enormous potential for harm to the public.

137.    All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders

of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

138. To prevent unauthorized users from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances, including registration and tracking requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances, acquisition transactions, and distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Each person or entity that is registered to distribute ARCOS Reportable controlled substances must report acquisition and distribution transactions to the DEA.

139. Acquisition and distribution transaction reports must provide data on each acquisition to inventory (identifying whether it is, e.g., by purchase or transfer, return from a customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, e.g., by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS Reportable controlled substance. 21 U.S.C. § 827(d) (l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day of discovery of such loss or theft.

140. In addition to filing acquisition/distribution transaction reports, each registrant is

40

required to maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. 21 U.S.C. §§ 827(a)(3), 1304.2l(a), 1304.22(b). It is unlawful for any person to negligently fail to abide by the recordkeeping and reporting requirements.

141. To maintain registration, distributors must also maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in §§ 130 1.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. 21 CFR § 1301.71.

142. For years the Distributor Defendants have known of the problems and consequences of opioid diversion in the supply chain, and have committed repeated violations of the laws and regulations of the United States as cited above consequently making them liable under West Virginia law.

143. To combat the problem of opioid diversion, the DEA has provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions. Since 2006, the DEA has conducted one-on-one briefings with distributors regarding their downstream customer sales, due diligence responsibilities, and legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders to the DEA). The DEA provided distributors with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases. The distributors were given case studies, legal findings against other registrants, and ARCOS profiles of their customers

whose previous purchases may have reflected suspicious ordering patterns.  The DEA emphasized the "red flags" distributors should look for to identify potential diversion.

144.    On September 27, 2006, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion.

145.    The September 27, 2006 letter reminded registrants that they were required by law to exercise due diligence to avoid filling orders that could be diverted into the illicit market. The DEA explained that as part of the legal obligation to maintain effective controls against diversion, the distributor was required to exercise due care in confirming the legitimacy of each and every order prior to filling. It also described circumstances that could be indicative of diversion including ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; disproportionate ratio of ordering controlled substances versus non-controlled prescription drugs; the ordering of excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to make a determination if the order is indeed suspicious.

146.    The Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," emphasizing the critical role of each member of the supply chain in distributing controlled substances.

147. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

148. Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

149. For example, a Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain. He further extolled that Cardinal was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any *outside* criminal activity" (emphasis added).

150. McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our Country."

151. These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

152. In addition to the obligations imposed by law, through their own words, representations, and actions, the Distributor Defendants have voluntarily undertaken a duty to protect the public at large against diversion from their supply chains, and to curb the opioid epidemic. In this voluntary undertaking, the Distributor Defendants have miserably and negligently failed.

153. The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties

43

recovered by state and federal agencies- including actions by the DEA related to violations of the Controlled Substances Act.

154.    In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.  In December 2016, a Department of Justice press release announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act. In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to certain pharmacies.

155.    In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a $13.25 million civil fine.

156.    In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.

157.    Relying upon state laws and regulation, various state boards of pharmacy have directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion, a duty recognized under state laws and regulations.

158.    Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

159.    The Distributor Defendants have the ability and owe the duty to prevent opioid

diversion, which presented a known or foreseeable risk of damage to Plaintiffs.

160.    The Distributor Defendants have supplied massive quantities of prescription opioids in West Virginia with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

161.    Each Distributor Defendant knew or should have known that the amount of the opioids that it allowed to flow into West Virginia was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

162.    The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in West Virginia; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

163.    On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing patients and citizens of West Virginia to perform due diligence

inspections to ensure that the controlled substances the Distributors Defendants had furnished were not being diverted to illegal uses.

164.    On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the patients and citizens of West Virginia, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

165.    It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the consumer market of West Virginia with highly-addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

166.    It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including neo-natal addiction and NAS.

167.    The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

168.    The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed to patients and citizens of West Virginia were being dispensed based on invalid or suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third-parties, and Plaintiffs.

169.    The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become patients in West Virginia, but they persisted in a pattern of

distributing commonly abused and diverted opioids in geographic areas -and in such quantities, and with such frequency- that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

170.     If the Distributor Defendants adhered to effective controls to guard against diversion significant damages would have been avoided.

171.     The Distributor Defendants made substantial profits over the years based on the diversion of opioids affecting West Virginia.  Their participation and cooperation in a common enterprise has foreseeably caused harm to A.P. Riling.

172.     The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed an intentional or reckless disregard for Plaintiffs. Their conduct poses a continuing economic threat to the communities that must deal with ongoing needs of children afflicted with NAS.

173.     Upon information and belief, in 2006 and 2007, and probably for years before that the Distributor Defendants were aware of pharmacies in southern West Virginia and pharmacies and clinics in Florida (which by this time were fueling the national epidemic) that were placing suspicious orders of its products.  Upon information and belief, the Distributor Defendants negligently and recklessly declined to report or control the activities of these pharmacies and clinics, and recklessly facilitated those activities.

174.     Upon information and belief, in 2006 and 2007, and probably for years before that, the Distributor Defendants were aware of suspicious orders being placed by Country Roads Mart Pharmacy, in Glen Daniel, West Virginia; by Charlie's Pharmacy, in Pineville, West Virginia; by Rite Aid Pharmacy, in Oceana, West Virginia; and by Westside Pharmacy, in Oceana, West Virginia.  Upon information and belief, these suspicious orders included orders for

a disproportionate amount of oxycodone and other opioids, and orders from these pharmacies for oxycodone and other opioids from multiple distributors.  The Distributor Defendants declined to report or otherwise control these suspicious orders.

175.    As a result of the negligent and reckless conduct of the Distributor Defendants described in the preceding paragraphs in facilitating the diversion of oxycodone rather than maintaining effective controls against diversion, A.P. Riling was born addicted to oxycodone, suffered at the start of life from the short-term effects of NAS, and continues to suffer from the persistent effects of prenatal exposure to oxycodone, including difficulties with attention, mood, and cognition.

## CAUSES OF ACTION

## <u>COUNT I – PUBLIC NUISANCE</u>

176.    Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

177.    The nuisance is the over-saturation of opioids in West Virginia for non-medical purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use, including the increasing incidence of NAS.

178.    All Defendants substantially participated in nuisance-causing activities.

179.    Defendants' nuisance-causing activities include selling or facilitating the excessive sale and diversion of prescription opioids to citizens of West Virginia, as well as to wholly innocent users, including A.P. Riling.

180.    Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to

48

detect, halt and report suspicious orders of controlled substances.

181.    Defendants' activities unreasonably interfere with the rights of Plaintiffs.

182.    The Defendants' interference with these rights of Plaintiffs is unreasonable because it:

    a.    Has harmed the children and public health services of West Virginia;

    b.    Is proscribed by statutes and regulation, including the CSA and the consumer protection statute;

    c.    Is of a continuing nature and it has produced long-lasting effects; and

    d.    Defendants have reason to know their conduct has a significant effect upon babies born addicted to oxycodone or other opioids.

183.    The nuisance undermines public health, quality of life, and safety. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within families and entire communities.

184.    Defendants' nuisance-causing activities preceding the birth of A.P. Riling were not outweighed by the utility of Defendants' behavior.  In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in failing to identify, halt, and report suspicious opioid transactions. There is no legitimate societal interest in Manufacturer Defendants dissemination of false "scientific" facts and advice.

185.    At all times, all Defendants possessed the right and ability to control the nuisance-causing outflow of opioids from pharmacy locations or other points of sale.  Pharmaceutical Defendants flooded the distribution channels and the geographic and demographic area of West Virginia with opioid pills.  Distributor Defendants had the power to shut off the supply of illicit opioids to patients and consumers of West Virginia, yet did the opposite by flooding the U.S.

 (including West Virginia) with opioid pills.

186.    As a direct and proximate result of the nuisance, Plaintiff A.P. Riling has suffered unique harms different from the public at large, namely, that she personally suffers from NAS and the persistent effects of prenatal exposure to oxycodone, including problems with attention, mood, and cognition.

187.    Defendants should be required to pay damages to A.P. Riling for injuries suffered as a result of the nuisance they created.

## COUNT II – NEGLIGENCE, GROSS NEGLIGENCE, AND RECKLESSNESS

188.    Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

189.    Defendants owe a duty to Plaintiff A.P. Riling to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

190.    There is no social value to Defendants' challenged behavior.  In fact, Defendants' entire conduct, behavior, actions, misrepresentations, conspiracies, and omissions are against the law.

191.    On the other hand, there is immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of A.P. Riling.

192.    Defendants' behavior caused a substantial injury and damage to A.P. Riling.

193.    Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

> a.    Consciously supplying the market in West Virginia with highly-addictive oxycodone, including misrepresenting, understating, or obfuscating the highly addictive propensities of oxycodone and opioid pills generally;

b.      Using unsafe marketing, labeling, distribution, and dispensing practices, including failing to warn or advise physicians to conduct an addiction family history of each and every potential patient;

c.      Affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

d.      Failing to properly train or investigate their employees;

e.      Failing to properly review and analyze prescription orders and data for red flags;

f.      Failing to report suspicious orders or refuse to fill them;

g.      Failing to provide effective controls and procedures to detect and/or guard against theft and diversion of controlled substances;

h.      Failing to police the integrity of their supply chains; and/or

i.      Creating misleading information with the intention of having prescribing physicians rely upon it.

194.    Each Defendant had an ability to control the opioids at a time when it knew or should have known it was passing control of the opioids to an actor further down in the supply chain that was incompetent or acting illegally and should not be entrusted with the opioids.

195.    Each Defendant sold prescription opioids in the supply chain knowing (a) there was a substantial likelihood many of the sales were for non-medical purposes and (b) opioids are an inherently dangerous product when used for non-medical purposes.

196.    Defendants were negligent or reckless in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent or ameliorate such distinctive and significant dangers.

197.     Controlled substances are dangerous commodities. Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business.

198.     Defendants were also negligent or reckless in failing to guard against foreseeable third-party misconduct, *e.g.*, the foreseeable conduct of: corrupt prescribers, corrupt pharmacists and staff, and/or criminals who buy and sell opioids for non-medical purposes.

199.     Defendants are in a limited class of registrants authorized to legally distribute controlled substances.  This places Defendants in a position of great trust and responsibility vis-a-vis Plaintiff.  Defendants owe a special duty to Plaintiff A.P. Riling.

200.     Plaintiff A.P. Riling is without fault, and the injuries to A.P. Riling would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

201.     The aforementioned conduct of Defendants proximately caused damage to Plaintiffs and A.P. Riling.

## <u>COUNT III - CIVIL CONSPIRACY</u>

202.     Plaintiff reasserts the allegations in the foregoing paragraphs as if fully set out herein.

203.     The Pharmaceutical Defendants continuously supplied prescription opioids to the Distributor Defendants despite having actual or constructive knowledge that said Distributors were habitually breaching their common law duties and violating the CSA. The Distributor Defendants continuously supplied prescription opioids to pharmacies despite having actual or constructive knowledge that said pharmacies were habitually breaching their common law duties and violating the CSA.

204.    Without the Distributor Defendants' supply of prescription opioids, pharmacies would not be able to fill and dispense the increasing number of prescription opioids throughout West Virginia.

205.    No Pharmaceutical Defendant in this opioid network would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the Distributor Defendants, and no Distributor Defendant would have succeeded without the Pharmaceutical Defendants, and none would have succeeded so significantly without engaging in the wrongful conduct as herein alleged.

206.    The Pharmaceutical Defendants likewise benefitted from this distribution conspiracy in that the more pervasive opioid diversion became, the more the Pharmaceutical Defendants profited. Despite access to the same information in the hands of the Distributor Defendants, the Pharmaceutical Defendants ignored the warning signs of opioid diversion.

207.    As a result of the concerted actions between and among the Defendants, the Plaintiffs have suffered damages.

208.    Plaintiffs and A.P. Riling demand judgment against each Defendant for compensatory damages.

## COUNT V - PRODUCTS LIABILITY

209.    Plaintiff reasserts the allegations in the foregoing paragraphs as if fully set out herein.

210.    At all times material to this action, Defendants were engaged in the business of the design, development, manufacture, testing, packaging, promotion, marketing, distribution, labeling, and/or sale of opioid products.

211.    At all times material to this action, Defendants' opioid products were expected to

reach, and did reach, consumers in the State of West Virginia and throughout the United States, including Plaintiffs herein, without substantial change in the condition in which they were sold.

212.    Defendants knew that the damage causing characteristics of Defendants' product include its addictive properties on potential mothers and its in utero impacts on their future children.

213.    Defendants knew that prolonged use of opioids leads to decreased effectiveness, requiring increases in doses to achieve the same level of pain relief, markedly increasing the risk of significant side effects and addiction. Defendants conducted studies documenting these risks, yet failed to publish the results or warn of the documented risks.

214.    The risks of opioid addiction and the risk to children in utero are grave and Defendants had a duty to warn about these risks.

215.    Providing such warnings would have been easily feasible, but would have interfered with Defendants' marketing efforts. Instead, Defendants' engaged in a multimillion dollar marketing and advertising effort promoting falsehoods and minimizing the risk of addiction and withdrawal from long term opioid use.

216.    Defendants knew that opioids are too addictive and to debilitating for long-term use for chronic pain, barring exceptional circumstances.  Defendants knew that the only safe uses for their product were end of life care, short term pain relief after surgery, and pain relief related to cancer.  Defendants failed to warn West Virginia physicians, potential mothers and pregnant women of the dangers of using their product outside of these areas.

217.    Defendants' products were unreasonably dangerous at the time they left the control of Defendants because of inadequate warning.

218.    Because of Defendants' knowledge of the risks to mothers and their neonatal

children, and their extensive efforts to obscure these risks, Defendants are liable for all resulting damages caused to Plaintiffs.

219.    The opioid product manufactured and/or supplied by Defendants were defective in design in that an alternative design exists that would prevent addiction, NAS and severe and permanent injury to pregnant women and their unborn children.

220.    A reasonably prudent manufacturer or seller would not have put Defendants' products on the market had it known of the products' dangerous condition and/or defective design.

221.    Defendants designed their product in such a way that it could easily be abused by crushing of pills with the resulting powder ingested by inhalation or injection.

222.    Defendants were aware that their products were being abused in this manner on a large scale, making this a reasonably anticipated use.

223.    Despite this knowledge, Defendants only recently altered the design of their product to be "enteric," that is, changed it to a form that prevented such crushing and consumption. This change was only made after years of public and legal pressure.

224.    Further, Defendants promoted their unreasonably dangerous design by actively undercutting the prescription of alternative nonsteroidal anti-inflammatory drugs, pushing the misinformation that such non-opioid drugs were not effective for the treatment of long term pain.

225.    Therefore Defendants are liable for the damages caused to the Plaintiff A.P. Riling by their opioid products' unreasonably dangerous and defective design and inadequate warnings of their opioids' addictive properties.

## COUNT VI - PUNITIVE DAMAGES

226.    Plaintiff reasserts each and every allegation set forth in all preceding paragraphs

as if fully restated herein.

227.    The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs.  Plaintiff A.P. Riling is thus entitled to recover punitive damages against Defendants.

228.    Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, in their activities and in failing to warn Plaintiff of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

229.    Defendants realized the imminence of danger to Plaintiff and other members of the public, but continued with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

230.    As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiff, Plaintiff suffered the injuries and dangers stated above.

231.    Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiff.  An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct.  Consequently, Plaintiff is entitled to an award of punitive damages.

232.    The conduct of Defendants as set forth herein was malicious, oppressive, willful,

wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiff. Plaintiff is thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

<u>**PRAYER FOR RELIEF AND REQUEST FOR JURY TRIAL**</u>

**WHEREFORE**, Plaintiffs Andrew G. Riling and Beverly Riling, individually and on behalf of A.P. Riling, request that the Court grant the following relief:

      a.      Compensatory damages;

      d.      Restitution;

      e.      Punitive damages;

      f.      Attorneys' fees and costs;

      g.      Pre and Post Judgment Interest;

      h.      All such other relief this Court deems just and fair; and

Plaintiff seeks a trial by jury for all counts so triable.

Date:  10/29/2018                           Respectfully submitted by:

 /s/ Alex McLaughlin
W. Stuart Calwell, Jr., Esq. (WVSB 0595)
L. Dante diTrapano, Esq. (WVSB 6778)
Alex McLaughlin, Esq. (WVSB 9696)
Benjamin D. Adams, Esq. (WVSB 11454)
The Calwell Practice, LC
500 Randolph St.
Charleston, WV 25302
(304) 343-4323

Timothy P. Lupardus, Esq.
Lupardus Law Office

Route 97
Twin Falls Road
Pineville, WV 24874
(304)-732-0250

and

P. Rodney Jackson, Esq. (WVSB 1861)
Law Offices of P. Rodney Jackson
106 Capitol Street
Charleston, WV 25301
(843) 870-6879

and

R. Booth Goodwin II, Esq. (WVSB 7165)
Goodwin & Goodwin, LLP
300 Summers Street, Ste. 1500
Charleston, WV 25301
(304) 346-7000